# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **DEBORAH M. HARRIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case number 4:10cv0908 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael

J. Astrue, the Commissioner of Social Security (Commissioner), denying Deborah Harris'

application for disability insurance benefits (DIB) under Title II of the Social Security Act

(the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI

of the Act, 42 U.S.C. § 1381-1383b.[1] Ms. Harris has filed a brief in support of her complaint;

the Commissioner has filed a brief in support of his answer.

## Procedural History

Deborah Harris (Plaintiff) applied for DIB and SSI in May 2006,[2] alleging a disability

as of February 2005 caused by back problems, a hernia, and a blood clot in her right hip.  (R.[3]

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

[2]Previous applications had been denied initially in August 2005 and not pursued further.

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

at 132-38, 148-51.)  These applications were denied initially, on reconsideration, and after

a hearing held in June 2009 before Administrative Law Judge (ALJ) David J. Manley.  (Id.

at 7-74, 78-83.)  The Appeals Council denied her request for review, effectively adopting the

ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Beverly Majors, M.S., a vocational expert (VE),

testified at the administrative hearing.

Plaintiff testified that she was then 53 years old and recently married.  (Id. at 24, 28.)

She weighs 198 pounds.  (Id. at 36.)  She has two grown sons.  (Id. at 31.)  She left school

after the tenth grade when her parents took her out to help around the house.  (Id. at 29.)  She

never obtained a General Equivalency Degree (GED).  (Id.)  She has no vocational or trade

school training.  (Id.)

She has had five hernia operations.  (Id. at 30.)  The netting that had been placed to

contain the hernia had been taken out after she was in a car accident in February 2007.  (Id.)

The hernia pushes her intestines when she tries to lift something.  (Id.)  It does not hurt when

she sits or stands.  (Id. at 31.)

Her knee still hurts after she was injured in a car accident in December.  (Id.)  Her

doctor told her she no longer needed to wear a brace on the knee.  (Id. at 31-32.)  A doctor

at a clinic has placed her on Ibuprofen for the swelling in her leg.  (Id. at 32.)  Also, she has

seizures because of fluid in her ear.  (Id. at 32-33.)  She had a seizure the night before and

the night before that.  (Id. at 33.)  When she has a seizure, she gets dizzy and has to lie or sit

- 2 -

down.  (Id.)  Her doctor has referred her to another doctor for the seizures.  (Id. at 34.)  This problem just started a couple of days ago.  (Id.)  She takes medication for the ear problems.  (Id.)

Plaintiff has never had a driver's license because no one ever taught her how to drive.  (Id.)  She does not smoke, drink alcohol, or do illegal drugs.  (Id. at 36.)

Plaintiff likes to do word search puzzles and jigsaw puzzles with 5,000 pieces.  (Id. at 35.)  When her husband is at work, she takes walks around their apartment building.  (Id. at 37.)  She does not go outside.  (Id.)

Plaintiff has back problems.  (Id. at 38.)  One doctor told her she would be paralyzed if she had a fusion; another doctor told her it would be best not to have the operation.  (Id.)  Her back causes her pain if she sits or lies in bed.  (Id.)  When she takes short walks, she "feel[s] it pressing on [the] lower part of [her] back."  (Id. at 39.)  Daily, she is light-headed and gets real dizzy and passes out when she stands up.  (Id.)  Her left leg swells a lot when she takes short walks.  (Id. at 40, 41, 43-44.)  Her doctor has told her to see an orthopedist.  (Id. at 40.)  He also told her he was going to put her on thyroid medicine at some point when she was not taking another medication, but a subsequent test showed no problem.  (Id. at 42.)  Her blood clot has been healed.  (Id. at 44.)

Asked by her attorney what she can do, Plaintiff replied that she can stand for approximately an hour and then has to sit down for fifteen or twenty minutes because her lower back will start hurting; she can sit for approximately thirty to fifty minutes before she has to get up and walk and has to have pillows behind her back; she can not lift anything

heavier than twenty-five pounds[4]; and she can not bend or reach forward very far.  (Id. at 44-46.)  She has no problem concentrating.  (Id. at 47.)  Because of her various problems, she would miss work two or three days a month.  (Id.)

Ms. Martin testified as a VE.  She classified Plaintiff's past work tacking and inspecting rugs as light work with a specific vocational preparation number (SVP) of 4.[5]  (Id. at 49.)

The ALJ then asked her about a hypothetical claimant who is in their mid-50s and has the same work history as Plaintiff, a limited education, no non-exertional restrictions, no mental impairments, and exertional restrictions of occasionally lifting or carrying fifty pounds, frequently lifting or carrying twenty-five pounds, and standing, walking, and/or sitting with normal breaks for six hours in an eight hour day.  (Id.)  Also, this claimant can push and pull, climb, balance, stoop, kneel, crouch, and crawl.  (Id. at 50.)  The VE testified that this claimant could perform Plaintiff's past relevant work.  (Id.)

The ALJ modified the hypothetical by restricting the claimant to lifting thirty pounds occasionally and twenty pounds frequently and to bending to no further than forty-five degrees.  (Id.)  This claimant can also perform Plaintiff's past relevant work.  (Id.)

---

[4]Plaintiff first testified that she could not lift anything heavier than fifty pounds.  After being told by her attorney that that was a "pretty heavy weight," she testified she could lift twenty-five pounds at most.

[5]The Eighth Circuit Court of Appeals recently observed that "[t]he SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. . . .  2 *Dictionary of Occupational Titles* app. C, at 1009 (4th ed.1991)."  **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).  The higher the number, the longer the time.  See **id.**

Plaintiff's attorney asked about a hypothetical claimant of Plaintiff's age and education but who is limited to standing or walking for one hour at a time before having to take a fifteen to twenty minute break.  (Id.)  This claimant will not be able to perform Plaintiff's past relevant work as it is generally performed in the national economy.  (Id. at 51.)  On being asked if she would be allowed to take such breaks at her former job, Plaintiff replied that she had been.  (Id.)

Plaintiff's attorney then asked the VE about a person of Plaintiff's age, limited education, and lifting capacity who is limited to standing and walking for no more than a total of four hours in an eight-hour day.  (Id.)  Such a claimant can not perform Plaintiff's past relevant work.  (Id.)  If this claimant suffers from lightheadedness and can not be exposed to unprotected heights or moving machinery, she can perform Plaintiff's past relevant work as Plaintiff performed it and as it is generally performed.  (Id. at 52.)  If someone can perform occasional crouching, crawling, and kneeling, she can perform Plaintiff's past relevant work, but can not if she is restricted to no stooping.  (Id. at 55.)  If the person missed two or three days of work a month, there are no jobs she can perform.  (Id. at 55-56.)

The ALJ then asked Plaintiff why she had stopped working at the rug factory.  (Id. at 56.)  She explained that she was let go in 2000 after she missed too many days of work when her mother died.  (Id.)  She had asked for her job back but was refused.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and assessments of her physical residual functional capacity.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing her height as 5 feet 1 inch and her weight as 195 pounds.  (Id. at 158.)  Her ability to work is limited by back problems, a hernia, and a blood clot in her right hip.  (Id. at 159.)  These impairments are limiting because she needs a lot of rest and has to stay off her right leg.  (Id.)  The impairments first bothered her in 2005 and prevented her from working as of February 7 of that year.  (Id.)  She worked after that, however, and stopped working on April 1, 2006.  (Id.)  She worked as a laborer from 1990 to April 2006.  (Id.)  This job required packing and inspecting rugs.  (Id. at 160.)  She walked, stood, stooped, and crouched for eight hours a day.  (Id.)  The heaviest weight she lifted was ten pounds.  (Id.)  She lifted and carried boxes of rugs.[6]  (Id.)  Her only medication was Coumadin, a blood thinner.  (Id. at 164.)  She had completed the tenth grade; she did not attend special education classes.  (Id. at 165.)

Completing a supplemental questionnaire, Plaintiff reported that her fiancé, Tim Harris, took care of her.  (Id. at 177.)  He helps her with her bills.  (Id. at 178.)  She can prepare a meal by herself; he helps her if asked.  (Id.)  She helps her son, with whom she lives, with the dishes and light housework.  (Id.)  The most she can carry when grocery shopping is two bags.  (Id.)  She does the laundry by herself.  (Id. at 179.)  She has not had

---

[6]She explained at the hearing that these boxes were heavier than ten pounds.

to stop doing any activities because of her health.  (Id.)  She can sit for two or three hours before changing positions and can lift and carry about five pounds.  (Id.)  If she walks up hill, she has to stop and catch her breath.  (Id.)  She does not have any problem using her hands.  (Id. at 180.)  Her pain began in April of that year and started when she took short walks.  (Id.)  The pain is very sharp and radiates from her right hip to her knee.  (Id.)  It occurs if she does not take her blood clot medication on time.  (Id. at 181.)  The medication and hot showers relieve the pain.  (Id. at 182.)  She has never attended physical therapy.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 193-97.)  She continued to have problems with her right leg because of her blood clot.  (Id. at 193.)  She did not have any money for medication.  (Id.)  She was prescribed Warfarin for the clot; the medication made her sick.  (Id. at 195.)  She could not walk or stand because of the clot.  (Id.)  On another appeal form, Plaintiff reported that the hernia on her left side kept getting bigger and made her very uncomfortable.  (Id. at 204-08.)  This occurred in April 2007.  (Id. at 204.)  She also has back problems and problems lifting.  (Id. at 206.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in March 2004 when at a post-operative checkup at Methodist Healthcare[7] Plaintiff was described as being in no apparent distress and doing well.  (Id. at 213.)  Her pain was controlled.  (Id.)  She was to return in two weeks, but returned in three.  (Id. at 210-

_____

[7]There is no indication in the record of where Methodist Healthcare is located or when the operation occurred.  It appears to have been for her hernia.

- 7 -

13.)  She was then doing "a lot better" and was not in pain.  (Id. at 210.)  She had no complaints.  (Id.)  She did not need any pain medication.  (Id.)  She and her fiancé were moving to a different state.  (Id.)

Plaintiff telephoned in May to complain of a yellow drainage from her naval.  (Id. at 209.)  She was leaving town on Friday.  (Id.)  She was told to go to the emergency room before she left town.  (Id.)  She indicated she would go that day.  (Id.)

On January 15, 2005, Plaintiff went to the Phelps County Regional Medical Center (Phelps Center) in Missouri, complaining of a naval discharge since the previous March when she had had adhesion surgery.  (Id. at 235-41.)  She was given medication and told to follow-up with the community clinic the next week.  (Id. at 239.)

Plaintiff returned to Phelps Center on February 7 after hurting her back when she fell in some mud getting out of the car after an accident.  (Id. at 227-34.)  She had no history of back pain.  (Id. at 232.)  An x-ray revealed a minimal L1 compression fracture of an indeterminate age.  (Id. at 234.)  She was given medication and discharged when feeling better.  (Id. at 230, 231.)  Six days later, however, she returned with complaints of back pain.  (Id. at 218-26.)  A computed tomography (CT) scan of her back revealed "[a] moderately comminuted burst fracture of the superior endplate of L1 . . . with approximately 60% loss of anterior vertebral body height."  (Id. at 226.)  Plaintiff was transferred to St. John's Regional Medical Center (St. John's).  (Id. at 221, 277-92.)  It was determined there that the mesh material used to repair a ventral (abdominal) hernia was infected and needed to be removed.  (Id. at 278.)  It was.  (Id.)  One day after the surgery, she had no fever and was

started on a diet.  (Id.)  She was discharged on February 21 with instructions on diet, activity, and wound care.  (Id.)  She was to follow up in one week.  (Id.)

Plaintiff went to the emergency room at St. John's on April 23 with complaints of abdominal pain for the past week and chronic back pain since the car accident in February. (Id. at 267-76.)  The abdominal pain had begun after she fell on her right side.  (Id. at 271.) A CT scan of her abdomen and pelvis was negative with the exception of revealing a periumbilical hernia or diastasis rectus[8] and midline intra-abdominal wall bruising or soft tissue scarring.  (Id. at 275-76.)  This reflected no significant change since a February 14 CT scan.  (Id. at 276.)  She was given a prescription for Prevacid and told to call Dr. North the next day for an appointment.  (Id. at 268, 272.)

On May 12, Plaintiff went to the St. John's emergency room with complaints of a productive cough and congestion.  (Id. at 258-66.)  She was given medications and discharged home with directions to contact Dr. Crowe for further evaluation.  (Id. at 259.) One week later, she returned.  (Id. at 252-58.)  She continued to have low back pain and was "neurologically intact."  (Id. at 253.)  She had 5/5 strength, symmetric reflexes, and a limited range of motion.  (Id.)  She was wearing a brace.  (Id.)  The physician, Bassam R. Hadi, M.D., noted that x-rays showed an increase in kyphosis[9] at L1.  (Id. at 253-57.)  Dr. Hadi

---

[8]A "[d]iastasis recti is a separation between the left and right side of the rectus abdominis muscle, which covers the front surface of the belly area."  Medline Plus, Diastasis recti, http://www.nlm.nih.gov/medlineplus/ency/article/001602.htm (last visited Sept. 13, 2011).  It usually heals on its own unless a hernia develops.  Id.

[9]Kyphosis is "[a] deformity of the spine characterized by extensive flexion."  Stedman's Medical Dictionary, 925 (26th ed. 1995).

concluded that she would require "operative stabilization" and scheduled her for such with several precautions to be followed "as the bacterial infection may be a high risk plus her hygiene status is quite poor." (Id. at 253.) He opined that a T11 to L3 fusion would suffice as long as she did not get an infection. (Id.) The following week, Eric Fulnecky, M.D., examined Plaintiff in anticipation of the surgery and found no current signs or symptoms of an active infection or recurrence. (Id. at 248.) He recommended two preoperative treatments to minimize the risk of infection from the surgery. (Id.) On June 6, another doctor, Sunghoon Lee, M.D., examined Plaintiff and the x-ray films and opined that the Plaintiff had a "very slight kypos," less than ten degrees, that was "close to the normal curvature at the thoracollumbar junction." (Id. at 247.) Given that the curvature was slight, he did not recommend surgery but favored conservative treatment. (Id.)

On December 29, Plaintiff went to the emergency room at the Pottsville Hospital and Warne Clinic (the Pottsville Clinic) in Pennsylvania with complaints of abdominal pain. (Id. at 301-04.) Her past medical history listed only chronic back pain. (Id. at 301.) The pain was "probably" caused by gastroesophageal reflux disease. (Id. at 302.) She was given Phenergan, an antihistamine, and Zantac, for heartburn. (Id.) A later x-ray revealed "[m]ild to moderate compression at the superior endplate of L1 with undetermined chronicity" and "[m]ultilevel degenerative changes within the lumbar spine with mild levoscoliosis." (Id. at 300.) An ultrasound of her abdomen was normal. (Id. at 299.)

Plaintiff was examined by Keith Girton, M.D., at the Pottsville Clinic on January 6, 2006. (Id. at 295-96.) Her gait was normal, and she was able to get on and off the examining

- 10 -

table without any assistance.  (Id. at 295.)  There was no tenderness in her cervical or thoracic spine, but there was in her lumbar spine.  (Id.)  Forward bending was to fifty-five degrees.  (Id.)  Straight leg raises were negative.[10]  (Id.)  She reported that the St. John's physicians had told her she was unable to work.  (Id.)  She was not taking any regular medications.  (Id.)  Dr. Girton recommended a magnetic resonance imaging (MRI) of her spine.  (Id. at 296.)  The MRI revealed "remote compression deformity of the superior endplate of the 1st lumbar [L1] vertebral body with resulting osseous encroachment on the anterior spinal canal with no impingement on the spinal cord" and degenerative bulging discs at T12-L1, L1-2, L2-3, and L5-S1 with no focal disc herniations or significant spinal stenosis in the lumbar spine.  (Id. at 297-98, 400-01.)  Dr. Girton noted that these findings suggested that the spinal problems were a remote injury.  (Id. at 294.)  With the exception of continued tenderness in the upper lumbar area, her neural examination "remain[ed] normal."  (Id.)  Dr. Girton recommended a lumbar epidural steroid injection; Plaintiff agreed.  (Id.)

Plaintiff went to the Pottsville Clinic emergency room on February 22 with complaints of abdominal pain and a lump.  (Id. at 418-19.)  The diagnosis was a reducible umbilical hernia.  (Id. at 418.)  Plaintiff was to be referred to surgery and was given Naprosyn for pain.  (Id.)

---

[10]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

On March 1, Abdul Wahhab, M.D., a Pottsville physician, saw Plaintiff for her hernia. (Id. at 307.)  He noted that she had no insurance, had had three hernia repair surgeries, and had to have the mesh removed the previous fall when it became infected.  (Id.)  He further noted that he was not comfortable operating on her due to her surgical history and advised her to go to a tertiary care center.  (Id.)

Also in March, Plaintiff consulted Marylou Rainone, D.O.  (Id. at 314-16, 326-27, 360.)  She reported on a patient information questionnaire that she took Advil as needed.  (Id. at 315.)  She had abdominal pain due to her hernia, shortness of breath and leg pain when she took long walks, and dizziness when she stood up too fast.  (Id. at 316.)  A CT scan of her abdomen and pelvis showed a large ventral hernia with segments of the small bowel and colon without gross evidence of bowel obstruction and without evidence of strangulation. (Id. at 332, 365.)  Dr. Rainone anticipated doing a hernia repair with mesh on April 19.  (Id. at 326-27, 349-50, 360, 382-84.)  Plaintiff was to apply for medical assistance.  (Id. at 383.)

On April 5, Plaintiff went to the Pottsville Clinic emergency room with complaints of right thigh pain of several days duration.  (Id. at 347-48, 377-81, 423-24.)  There was no joint redness or swelling, but there was anterior right thigh tenderness.  (Id. at 381, 424.)  X-rays of the pelvis and right hip and femur showed degenerative joint disease but were otherwise unremarkable.  (Id. at 329-31, 348, 362-64, 381, 431-33.)  An ultrasound showed a small area of non-occlusive deep vein thrombosis of the right distal superficial femoral vein.  (Id. at 328, 348, 361, 381, 429-30.)  The diagnosis was deep vein thrombosis.  (Id. at 378, 381, 427.)  She was admitted and given heparin, an anti-coagulant, and Coumadin.  (Id. at 341, 374, 421,

- 12 -

425-28.) She was able to walk the next day and was discharged on April 9 with instructions to continue taking Coumadin and follow-up with the admitting physician, Cristin A. Weicker, D.O., in one week.  (Id. at 341-42, 374-75, 421-22.)

On April 10, it was noted in Dr. Rainone's records that Plaintiff had been in the hospital for a blood clot and would call to reschedule the surgery when she was cleared by her other physician. (Id. at 325.)

Plaintiff saw Robert DeColli, D.O., a provider in Dr. Weicker's office on April 24 to establish care as a new patient. (Id. at 439-41.) Her only complaint was of "mild fatigue" and left-sided abdominal pain.  (Id. at 439.)  Her Coumadin dosage was changed.  (Id. at 439.) She was to follow-up with Dr. Rainone for her abdominal hernia.  (Id. at 440.)

Plaintiff called Dr. Weicker's office on May 11, reporting that her right leg was very red and painful.  (Id. at 438.)  She was told to go to the emergency room.  (Id.)

Plaintiff was taken to the Pottsville Clinic emergency room on May 28 after she fainted.  (Id. at 409-17.)  A CT scan was negative for a pulmonary embolism.  (Id. at 410.) An electrocardiogram (EKG) showed a normal sinus rhythm and no acute changes.  (Id. at 407, 410.)  Blood work revealed normal cardiac enzymes and liver function was normal.  (Id. at 410.)  A chest x-ray revealed no evidence of acute cardiopulmonary disease.  (Id. at 408.) Her symptoms "dramatically improved" and she was discharged home with instructions to rest and drink fluids only for a few hours.  (Id. at 410.)  She was to follow-up with her family doctor.  (Id.)

- 13 -

On June 22, Plaintiff was informed by Dr. Weicker's office that they would no longer be treating her because she was insured through Medicaid.  (Id. at 437.)  Five days later, the office wrote that they would not be continuing with her medical care due to noncompliance.  (Id. at 390, 436.)

Three days later, Plaintiff went to the Pottsville Clinic emergency room with complaints of left-sided chest pain that radiated down her left arm.  (Id. at 06.)  She had taken five Advil and had had no relief.  (Id. at 403.)  Her symptoms were gone after nitroglycerin ointment was applied.  (Id. at 404.)  She refused to stay, signed out against medical advice, and said she would follow-up with her family doctor.  (Id.)

Plaintiff went to the Sycamore Shoals Hospital in Elizabethtown, Tennessee, on December 3, 2008, after she was hit by a car coming out of a driveway when she was on the sidewalk.  (Id. at 465-85.)  She had been able to walk approximately a mile and then had been driven to her apartment.  (Id. at 468.)  Her pain had increased over the next few hours so she went to the emergency room.  (Id. at 490.)  X-rays indicated a lateral plateau fracture of the left knee.  (Id. at 480-81.)  CT scans of the cervical spine, thoracic spine, chest, abdomen, and pelvis revealed mild to moderate degenerative changes of the cervical spine, remote compression fracture of the superior end plate of L1, and a very large ventral hernia.  (Id. at 482-85.)  There was no evidence of acute traumatic injury.  (Id.)  Her leg was splinted and she was discharged with instructions to wear the splint until she saw her orthopedist.  (Id. at 465, 469.)

Five days later, she saw Doug Albracht, D.O.  (Id. at 490-91.)  She reported that she had recently moved to the area from Kansas[11] and had been disabled since February 2005 due to a fracture of her lumbar spine sustained in an automobile accident.  (Id. at 490.)  When her left knee had been placed in a splint at the emergency room, she had been told to remain nonweight-bearing, but had not been given any crutches.  (Id.)  On examination, there was no evidence of joint swelling but was some slight tenderness to palpation over the lateral joint line.  (Id. at 491.)  She could flex and extend her knee actively to 80 degrees.  (Id.)  There was no evidence of instability.  (Id.)  The diagnosis was a "[m]inimally displaced type 1 lateral tibial plateau fracture [of the] left knee."  (Id.)  She would have some post-traumatic arthritis because of the injury.  (Id.)  She was placed in a hinged fracture brace and told to keep the knee in full extension most of the day.  (Id.)  She could unlock it to do knee range of motion exercises two to three times a day.  (Id.)  She was also given crutches, told to remain non-weight bearing on her left lower extremity, and was to return in two weeks.  (Id.)

Plaintiff did return, had her left knee x-rayed, and was told to remain nonweight-bearing and return in one month.  (Id. at 492, 497.)

When Plaintiff next saw Dr. Albracht, on January 19, 2009, she reported that her left knee was feeling much better.  (Id. at 493, 496.)  She had no significant pain, problems, or complaints.  (Id. at 493.)  She had been noncompliant with the instructions to remain nonweight-bearing[12] and reported that she had been walking without her crutches and

---

[11]Plaintiff testified at the administrative hearing that she had been unable to get any health care in Kansas due to her lack of funds and insurance.

[12]Her weight was then 200 pounds.  (Id. at 493.)

without significant discomfort.  (Id.)  She wanted to stop using the brace.  (Id.)  On examination, she had no tenderness to palpation over the lateral joint line of her left knee and no joint swelling; she could extend the knee to 105 degrees.  (Id.)  She had no pain with 100 percent weight bearing.  (Id.)  X-rays showed no change in the fracture alignment, but did show increased callus formation across the fracture site. (Id.)  She was instructed to increase her weight-bearing status to twenty-five percent and use her crutches or walker at all times.  (Id.)  She was to continue using her brace.  (Id.)  She was described as being "quite non-compliant."  (Id.)

The following month, on February 18, Plaintiff continued to be non-compliant with the weight-bearing instructions.  (Id. at 494-95.)  Rather, she had been 100 percent weight-bearing for the past seven to eight weeks without any problem.  (Id. at 494.)  Dr. Albracht noted that he had seen her walking around town picking up bottles and cans for recycling and not wearing her brace.  (Id.)  She could extend her left knee to 100 degrees and flex to 130 degrees.  (Id.)  She had no pain with 100% weight-bearing.  (Id.)  She was described as "doing very well," told to discontinue using the brace, released to return to her regular activities, and told to return as needed.  (Id.)

On April 7, Plaintiff went to the Johnson City Downtown Clinic with complaints of pain and swelling in her left shin following a hit-and-run accident.  (Id. at 510.)  She returned the following week with complaints of a worsening cough with phlegm.  (Id. at 508.)  She denied having any headaches, chest pain, or shortness of breath.  (Id.)  Ten days later, she went to the clinic with complaints of feeling light-headed for the past one and one-half

- 16 -

months.  (Id. at 506.)  Five days later, on April 29, she went to the clinic and requested that

her hernia be operated on.  (Id. at 504, 512, 514, 516.)  It was noted that she had been told

previously that her hernia was not operable.  (Id.)  On May 5, she reported that she was still

having problems with dizziness, and had been for three years.  (Id. at 502.)  On May 19, she

complained of a tooth abscess.  (Id.)

The ALJ also had before him the reports of an examining consultant and a non-

examining consultant issued pursuant to her applications.

Plaintiff was examined by Kamal Mohan, M.D., in February 2007.  (Id. at 449-54.)

She reported that she had fractured her back in February 2005 and consequently had trouble

walking long distances, squatting, kneeling, crawling, bending, lifting and carrying anything

heavy, and climbing stairs.  (Id. at 449.)  She did not use any ambulation aid and did not limp.

(Id.)  Due to deep venous thrombosis in her right hip, she takes Coumadin.  (Id. at 449-50.)

She had recently fractured the middle finger of her left hand and was using a splint on it.  (Id.

at 450.)  She last worked in early 2006 packing candy.  (Id.)  In addition to the Coumadin,

she was supposed to be on Toprol, for hypertension, but had not had the prescription filled.

(Id.)  On examination, she had a normal mood and affect; did not limp; could sit, stand, walk,

and climb on the examination table without difficulty; could speak clearly; and could

understand without difficulty.  (Id. at 451.)  She could forward flex with her lumbar spine to

45 degrees, extend to 20 degrees, and side flex to 20 degrees.  (Id. at 452.)  She could "squat

well."  (Id.)  She and a normal range of motion in her cervical spine and normal mobility in

her knees, hips, ankles, shoulder, elbows, and wrists.  (Id.)  Her hand grip was good; her

- 17 -

fingers and thumbs were normal.  (Id.)  She could make a good right fist, but was unable to

have the left tested due to her splinted middle finger.  (Id.)  Her mental functioning was

normal; her understanding was good.  (Id. at 453.)  Dr. Mohan opined that Plaintiff could sit

without any limitations; could stand and walk, with normal breaks, for six hours; and could

lift and carry thirty pounds occasionally and twenty pounds frequently.  (Id. at 453-54.)  She

could squat well but not bend more than forty-five degrees.  (Id. at 454.)  Her large incisional

hernia was asymptomatic.   (Id.)   She did not have any other hearing, speech, and

environmental limitations.  (Id.)

 In April 2007, Frank R. Pennington, M.D., completed a Physical Residual Functional

Capacity Assessment (PRFCA) for Plaintiff.  (Id. at 455-62.)  The primary diagnosis was a

back disorder; the secondary diagnosis was deep venous thrombosis in her right lower

extremity; and other impairments included a ventral hernia and a fracture of her left middle

finger.  (Id. at 455.)  These impairments resulted in exertional limitations of Plaintiff being

able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and

stand, walk, or sit about six hours in an eight-hour day.  (Id. at 456.)  Her ability to push or

pull was unlimited other than with these lifting and carrying restrictions.  (Id.)  She had

postural limitations restricting her climbing, balancing, stooping, kneeling, crouching, and

crawling to two-thirds of the time.   (Id. at 457.)   She had no manipulative, visual,

communicative, or environmental limitations.  (Id. at 458-59.)

 The same month, Plaintiff was rated on a Tennessee Department of Rehabilitation

Services' Vocational Analysis Worksheet as having the exertional capacity to lift a maximum

of fifty pounds and frequently lift twenty-five pounds and to sit, stand, or walk six hours during an eight-hour day.  (Id. at 186.)  She could frequently climb, balance, stoop, kneel, crouch, and crawl.  (Id.)  She had no manipulative, visual, communicative, or environmental limitations.  (Id.)

### The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five step evaluation process, the ALJ first found that Plaintiff met the insured status requirements only through June 30, 2006, and had not been engaged in substantial gainful activity since the alleged disability onset date of February 7, 2005.  (Id. at 12.)  The ALJ next found that Plaintiff had severe impairments of a diagnostic history of burst fracture of the L1 vertebral body, mild degenerative changes in the lumbar spine without focal disc herniation or significant spinal stenosis, status post multiple surgical repair/revision for incisional/ventral hernia and/or post-surgical wound infection, and a history of proximal venous embolism of the left lower extremity.  (Id. at 12-13.)  She did not have a severe mental impairment.  (Id. at 13.)  The impairments she did have did not, singly or in combination, meet or equal an impairment of listing-level severity.  (Id.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that she had the RFC to perform the full range of light work.  (Id.)  Specifically, she could lift-carry and/or push-pull up to thirty pounds occasionally and twenty pounds frequently, could stand and/or walk up to six hours in an eight-hour day, and could sit, climb, balance, kneel, crouch, or crawl without significant limitations.  (Id.)  In reaching this

- 19 -

determination, the ALJ considered the credibility of Plaintiff's statements. (Id. at 14-20.) He compared those statements with the objective evidence. For instance, he noted that Plaintiff testified that her hernia is increasing in size and causing chronic pain, but there was no evidence she had been prescribed pain medication. (Id. at 14.) In the same document, she reported that she helped her son with light housework, prepared meals, and laundered her clothes and also reported that she had stopped any activities. (Id. at 15.) She did complex jigsaw puzzles and word searches. (Id.) She has had no side effects from her long-term use of Coumadin. (Id.) There was no evidence she had ever been denied medical services due to an inability to pay for such. (Id.)

After summarizing the records of Plaintiff's medical treatment of her back and of Dr. Mohan's examination, the ALJ noted that her description to Dr. Mohan of her limitations was inconsistent with her demonstrated abilities. (Id. at 15-18.) As to her hernia, Plaintiff had not sought or required any ongoing medical care for this condition from early 2005 to early 2006. (Id. at 19.) When she did seek such care in February 2006, the ultrasound of her abdomen was within normal limits. (Id.) A December 2008 CT scan showed a very large ventral hernia but no evidence of bowel obstruction. (Id.) Rather, the stomach and bowel were described as being unremarkable. (Id.) Also, there was no evidence Plaintiff required ongoing treatment for her deep venous thrombosis other than taking Coumadin. (Id.) There was no evidence that the effects of her left knee injury met the durational requirement. (Id. at 20.) Nor had any of Plaintiff's treating physicians opined that her impairments precluded substantial gainful activity. (Id.)

With her RFC, Plaintiff could perform her past relevant work as a sewing machine operator in a garment factory and rug mill and a production packer as those jobs were performed by her and as they are performed in the local, regional, and national economies. (Id. at 20-21.)

She was not, therefore, disabled within the meaning of the Act. (Id. at 21.)

### Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe

impairment.   See 20 C.F.R. §§ 404.1520(c), 416.920(c).   The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."   **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a

- 22 -

sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting <u>Moore</u>, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting <u>Goff</u>, 421 F.3d at 792). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step

four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial

- 24 -

evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**Discussion**

Plaintiff argues that the ALJ erred by (1) not developing the record on whether she could meet the basic mental demands of competitive, remunerative work despite her mental limitations; (2) improperly considering the lack of medication when discrediting her testimony about the intensity of her impairments because the evidence showed she lacked the finances to pay for such medication; and (3) not making specific findings about the physical and mental demands of her past relevant work.

Plaintiff did not allege a mental impairment when filing for DIB and SSI, did not cite a mental impairment when testifying about her limitations, and never sought medical care for such an impairment.  Regardless, she argues that the ALJ failed in his duty to fully and fairly develop the record by not pursuing a line of inquiry on a mental impairment when the record showed she only had a ninth grade education and did not have a driver's license.

It is well established that "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th

- 25 -

Cir. 2005); accord **Johnson v. Astrue**, 627 F.3d 316, 319-20 (8th Cir. 2010); **Jones v. Astrue**, 619 F.3d 863, 969 (8th Cir. 2010). "Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations,' the claimant has received a 'full and fair hearing.'" **Id.** (quoting Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010)). Plaintiff received such a hearing. She left school after the tenth grade because her parents took her out of school to help around the house. There is no evidence that she had any difficulty learning; indeed, she did not attend special education classes. In answer to a question by the ALJ, she explained that she did not have a driver's license because no one had ever taught her how to drive. There is no implication that she could not have learned. Nor is there any indication that she had any difficulties performing her past relevant work caused by any mental impairment. On the other hand, she enjoyed completing complex jigsaw puzzles and did word search problems.

In **Wilcutts v. Apfel**, 143 F.3d 1134 (8th Cir. 1998), cited by Plaintiff, the Eighth Circuit found that an ALJ had failed in his duty to fully and fairly develop the record when concluding that the claimant could not be illiterate because he had a verbal IQ score of 68. **Id.** at 1137. The claimant's score on the verbally-administered IQ test did not contradict the otherwise-unrefuted evidence that he could not read. **Id.** In **Cunningham v. Apfel**, 222 F.3d 496 (8th Cir. 2000), also cited by Plaintiff, there was testimony "that should have alerted the ALJ to [the claimant's] mental limitations." **Id.** at 502 n.9. This evidence included a history of depression, a suicide attempt, and the report of the claimant's treating psychologist that he

had a severe impairment that would meet the listing for an affective disorder. **Id.** at 502.  In the instant case, there was no evidence at all, including the departure from school at the tenth grade and the lack of a driver's license, of a mental impairment.  Hence, the ALJ did not fail in his duty to fully and fairly develop the record.

Absent evidence that Plaintiff was denied medical treatment due to financial reasons, her failure to take pain medication is relevant to the credibility determination. **Goff**, 421 F.3d at 793.  Plaintiff contends that the first letter from Dr. Weicker's office establishes the presence of a financial reason for her failure to take pain medication.  Plaintiff misreads the letter.  The letter, see Record at 437, informed Plaintiff that Dr. Weicker's office would no longer be treating her *because she was insured by Medicaid*.  This reading is consistent with earlier references in the records of Dr. Rainone and the Pottsville Clinic to Plaintiff having applied for medical assistance.  Additionally, Plaintiff's financial situation apparently remained fairly constant, however, she routinely sought and obtained other medical care and prescriptions.

In her final argument, Plaintiff contends that the ALJ erred by not making specific findings about the physical and mental demands of her past work.  See SSR 82-62, 1982 WL 31386 (1982) (holding that a decision that a claimant can perform past relevant work must include findings as to (1) the claimant's RFC; (2) the physical and mental demands of the past work; and (3) whether the claimant's RFC would permit a return to the past work).  "A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to [her] past work."

**Groeper v. Sullivan**, 932 F.2d 1234, 1239 (8th Cir. 1991). A VE may offer evidence about the physical or mental demands of a claimant's past relevant work, "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 1560(b)(2). In **Wagner v. Astrue**, 499 F.3d 842, 854 (8th Cir. 2007), the Eighth Circuit held that an ALJ could rely on a VE's testimony in determining the demands of past relevant work. See also **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000) ("Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled."). In the instant case, the ALJ had before him Plaintiff's description in the Disability Report of the specific physical demands of her past work and the VE's testimony about those demands. Having found no mental limitations affecting Plaintiff's ability to work, he did not err by not inquiring into the mental demands of her past relevant work.[13]

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."

---

[13]Plaintiff's reliance on the case of **Gump v. Barnhart**, 334 F. Supp.2d 1155 (E.D. Mo. 2004), is unavailing. The ALJ in that case neither inquired of the Plaintiff about the specific demands of the job the ALJ identified, perhaps incorrectly, as past relevant work nor referred to that specific job in the Dictionary of Occupational Titles. **Id.** at 1163-64. Accord **Pfitzner v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999).

**Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted);

accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and

that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of September, 2011.